RENDERED: DECEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0180-DG

HOLLIE JACKSON, AS
ADMINISTRATOR OF THE ESTATE OF
EMMA HAYES, DECEASED, AND ON
BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF EMMA HAYES

APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2023-CA-0260
GRAVES CIRCUIT COURT NO. 21-CI-00367

MAYFIELD KY OPCO, LLC D/B/A
MAYFIELD HEALTH AND
REHABILITATION; CLEARVIEW
HEALTHCARE MANAGEMENT KY, LLC
D/B/A CLEARVIEW HEALTHCARE
MANAGEMENT; CRYSTAL JANES;
HUGHES ASH; SUSAN ALLEN, RN;
AND THE PORTOPICCOLO GROUP,
LLC

APPELLEES

**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>REVERSING AND REMANDING</u>**

Hollie Jackson, as administrator of his late mother's estate, appeals a
Court of Appeals ruling that affirmed the Graves Circuit Court's dismissal of
his lawsuit against nursing home defendants Mayfield, KY OPCO, LLC D/B/A
Mayfield Health and Rehabilitation; Clearview Healthcare Management, KY,
LLC D/B/A Clearview Healthcare Management; Crystal Janes; Hughes Ash;

Susan Allen; and the Portopiccolo Group, LLC (collectively, Mayfield).  The circuit court granted summary judgment in favor of Mayfield upon finding that it was entitled to immunity under KRS[1] 39A.275, Kentucky's COVID immunity statute.  After review, this Court holds that the circuit court erred by granting summary judgment.  We accordingly reverse the Court of Appeals' decision, vacate the circuit court's summary judgment order, and remand for further proceedings consistent with this Opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2018, then-eighty-five-year-old Emma Hayes was admitted to Mayfield, a nursing home.  Emma required twenty-four-hour monitoring and assistance with all aspects of daily life due to being wheelchair bound, her advanced age, and her numerous health conditions such as congestive heart failure, non-Alzheimer's dementia, epilepsy, syncope, chronic obstructive pulmonary disease, osteoarthritis, arteriosclerotic heart disease, diabetes, cholelithiasis, arteriosclerotic peripheral vascular disease, arteriosclerotic cerebrovascular disease, and pulmonary hypertension.

As detailed below, we know very little about Emma's level of care because Mayfield refused to respond to the majority of Jackson's requests for discovery.  However, portions of her medical records from Mayfield establish that on November 26, 2020, she tested positive for COVID and was transferred to Mayfield's dedicated COVID unit.  One week later on December 3, 2020, at

---

[1] Kentucky Revised Statutes.

8:51 a.m. Mayfield's staff attempted to rouse Emma in order to administer her numerous medications but were unable to. Abandoning that effort, Mayfield's staff took no action until nearly five hours later[2] at 1:45 p.m. when they took her vitals. By that time her blood pressure was 160/75, her pulse was forty-four beats per minute, her oxygen saturation was eighty-seven percent, her respiration was fifty breaths per minute and "labored," her temperature was ninety-nine point six degrees Fahrenheit, and there was "jerking/twitching of [her] upper extremities and head." Emma was accordingly transported by ambulance to Jackson Purchase Medical Center (JPMC), a local hospital.

The ambulance's patient care record stated that Emma's level of distress was "severe." The "chief complaint" listed was difficulty breathing and the "secondary complaint" was altered mental status. The emergency service worker's primary impression was "shortness of breath" and his or her secondary impression was "COVID-19 – confirmed by testing." The emergency room records from JPMC indicate that Emma was in respiratory distress when she arrived at 2:38 p.m., that she was intubated at 2:58 p.m., and that she passed away at 3:40 p.m.

Despite the fact that Emma was deceased by 3:40 p.m. on December 3, 2020, her medical records from Mayfield charted that evening mysteriously

---

[2] Mayfield asserted, and the circuit court found in its order granting summary judgment, that Mayfield took Emma's vitals at 9:51 a.m. on December 3 and found them to be normal. There is no evidence that this ever occurred based on any of Emma's medical records that are now before this Court. The circuit court also found that a chest x-ray was performed on December 2, 2020, that showed no acute cardiopulmonary disease. Again, we find nothing in Emma's medical records now before us that support that finding.

3

state that during the night shift from 6 p.m. on December 3 to 6 a.m. on December 4 she received assistance with bed mobility; she was assisted with dressing herself; that she voided her bowels, and the substance was putty-like; that a pressure reducing device was placed in her bed; that she was turned and repositioned in bed; that no troubling behavior such as crying, screaming, kicking, biting, spitting, or abusive language were observed; and that she refused to eat a snack.

Jackson filed the lawsuit at issue herein on November 9, 2021. His nine-count complaint alleged negligence, medical negligence, violations of a long-term care resident's rights, common law fraud, breach of fiduciary duty, wrongful death, entitlement to punitive damages, and individual counts of negligence against two administrators and a registered nurse. Jackson's complaint asserted that Mayfield knew Emma was dependent upon it for twenty-four-hour care and that due to its ongoing and routine indifference for her basic care and needs she suffered respiratory failure, significant pain that went untreated, the accelerated deterioration of her health, unplanned weight loss and malnutrition, violations of her dignity, and death.

The complaint alleged that Mayfield engaged in various acts of misconduct such as failing to maintain sufficient staffing levels and appropriate oversight of nursing personnel; failing to follow applicable rules and regulations promulgated by the Cabinet for Health and Family Services

4

(CHFS);[3] failing to maintain records; failing to allocate sufficient resources to ensure patients' basic care needs were met; failing to take reasonable steps to prevent, eliminate, and correct deficiencies in resident care; and failing to disclose a culture of patient harm within the facility.

The complaint further alleged that Mayfield failed to ensure Emma received timely and accurate care assessments, treatments, and medications; failed to ensure she received timely medical intervention in response to significant changes in condition; failed to recognize significant changes in her health status, failed to notify her physician and family of those changes, and failed to transfer her to a hospital when her health declined beyond Mayfield's ability to treat; failed to ensure Emma was kept free from mental and physical abuse; and that it took affirmative steps to conceal its own fraudulent conduct by manipulating and/or falsifying Emma's medical records in an attempt to make it appear that her minimum care needs were being met. It asserted that Mayfield's acts of negligence and medical negligence "[were] accompanied by such wanton or reckless disregard for the health and safety of [Emma] as to constitute gross negligence." None of Jackson's claims for relief were based on Emma's exposure to, or contraction of COVID, nor did he allege that Emma's injuries or death were caused by Mayfield's services or treatment to address the spread of COVID, or any services Mayfield performed outside the normal course

---

[3] To be clear, Jackson's complaint did not state that Mayfield failed to follow COVID regulations promulgated by CHFS, but rather that it failed to follow the non-pandemic related regulations it was required to follow as a licensed nursing home.

5

of its business in response to COVID.  Indeed, the word "COVID" appears nowhere in his complaint.

Mayfield's answer asserted a number of defenses.  Pertinent to our purposes herein, Mayfield contended that "[p]ending discovery, KRS 39A.275 [(the COVID immunity statute)] bars Plaintiff's Complaint in whole or in part[,]" and that "[p]ending discovery, the PREP[4] Act, 42 U.S.C.[5] § 247d-6d bars Plaintiff's Complaint in whole or in part."  For context, Kentucky's COVID immunity statute deems essential service providers[6] as agents of the Commonwealth "for the limited purpose of providing essential services arising from COVID-19[,]" and declares that "[a]ny essential service provider during the declared emergency of the COVID-19 pandemic shall not be liable for any COVID-19 claim."  KRS 39A.275(8)(a), (9).  "COVID-19 claim" is in turn defined as "any claim or cause of action for an act or omission arising from COVID-19[.]"  KRS 39A.275(1)(c).  Finally, the act defines "arising from COVID-19" as

> an injury or harm that allegedly occurred on or after the emergency was declared on March 6, 2020, and until the emergency declaration is withdrawn, revoked, or lapses, caused by or resulting from:
>
> 1. The actual, alleged, or possible exposure to, transmission of, or contraction of COVID-19;
> 2. Services, treatment, or other action performed to limit or prevent the spread of COVID-19; or
> 3. Services performed by an entity outside the normal course of its business in response to COVID-19[.]

---

[4] Public Readiness and Emergency Preparedness Act.

[5] United States Code.

[6] The parties do not dispute that Mayfield is an essential service provider.  *See* KRS 39A.275(9)(b).

KRS 39A.275(1)(a)1.-3. The statute does not provide immunity to essential service providers "for gross negligence, or wanton, willful, malicious, or intentional misconduct." KRS 39A.275(8)(b).

In contrast, the PREP Act provides immunity to "a covered person. . . with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if" a public health emergency has been declared with respect to such countermeasure by the Secretary of Health and Human Services. 42 U.S.C. § 247d-6d(a)(1), (b). A "covered countermeasure" is in turn defined as "a qualified pandemic or epidemic product[,]" "a security countermeasure[,]" "a drug. . . or device. . . that is authorized for emergency use[,]" or "a respiratory protective device that is issued by [NIOSH][7]. . . and that the Secretary determines to be a priority for use during a public health emergency[.]" 42 U.S.C. § 247d-6d(i)(1)(A)-(D). And a "covered person" is defined as the United States or a person or entity that is a manufacturer, distributor, or program planner of such countermeasure; a qualified person who prescribed, administered, or dispensed such countermeasure; or an official, agent, or employee of the foregoing entities or persons. 42 U.S.C. § 247d-6d(i)(2)(A)-(B). The Act does not provide immunity for "death or serious physical injury proximately caused by willful misconduct . . . by such covered person." 42 U.S.C. § 247d-6d(d)(1).

---

[7] National Institute for Occupational Safety and Health.

7

After Mayfield filed its answer, Jackson filed a notice of service of discovery requests on December 6, 2021. Several months later, in April 2022, defendant Portopiccolo Group filed a motion to dismiss based on the circuit court's alleged lack of personal jurisdiction. One month later the circuit court ordered the parties to "conduct limited discovery on the issue of personal jurisdiction, including a deposition of Defendant The Portopiccolo Group." It scheduled an evidentiary hearing on that issue for July 19, 2022. However, on June 14, 2022, prior to the deposition and evidentiary hearing, Portopiccolo filed a notice to voluntarily withdraw its motion to dismiss.

Also in April 2022, Mayfield filed its response to Jackson's first set of requests for the production of documents. Jackson had requested numerous documents, including copies of photographs and videos of Emma during her stay and a floor plan of the facility; all of Emma's clinical records; Emma's financial/business file from the facility; Emma's pre-admission screening; Emma's medication records; incident reports and related investigations concerning Emma; employee staffing records; all emails responsive to a search protocol Jackson provided; workload information documents; caregiver and management personnel records; Mayfield's policies and procedures of operation; employee disciplinary action records; records of complaints and critical communications regarding substandard care; and audit trails.[8]

---

[8] We note that all of the requests were limited to the time period of Emma's residency at Mayfield.

Mayfield objected to producing any of the documents Jackson requested apart from a floor plan of its facility and a copy of Emma's medical charts. And it appears that Mayfield did not provide the entirety of Emma's medical charts, as she was a resident from February 2018 to December 2020, but the medical charts of record are dated from October 28, 2020, to December 3, 2020. Mayfield likewise objected to the majority of Jackson's interrogatories.[9]

On October 26, 2022, Mayfield filed the motion for summary judgment at issue herein. One week later Jackson filed a thirty-page motion to compel that detailed why each of his discovery requests were relevant and appropriate. He also filed separate motions to compel the production of emails, to compel the production of audit trails, and to compel Mayfield's deposition. Rather than order the production of those documents or deposition, the circuit court set a hearing on Mayfield's motion for summary judgment for December 27, 2022.

On November 11, Jackson filed his response to Mayfield's motion for summary judgment. Attached to his response as exhibits, Jackson provided copies of Emma's medical records from Mayfield dated October 28, 2020, to December 3, 2020; Mayfield medical records that state it provided her care after her death as if she were still living as discussed above; Emma's death certificate; and an affidavit from Dr. David Mansfield. Emma's death certificate was prepared by Graves County Coroner Brad Jones and stated that her

---

[9] Defendant Clearview Healthcare also objected to all of Jackson's requests for the production of documents and most of his interrogatories. None of the other defendants below responded to the requests.

9

causes of death were "a. Acute Respiratory Distress due to (or as a consequence of): b. CHF[10] due to (or as a consequence of): c. COPD[11] due to (or as a consequence of): d. COVID-19[.]" Dr. Mansfield's affidavit stated that he was a medical doctor and had treated geriatric patients since 1982. "[B]ased on information available to [him] and [Emma's] medical records[,]" Dr. Mansfield attested to his opinion that COVID was not a substantial factor in causing her death. He further stated his belief that Mayfield and its operators "acted with wanton or reckless disregard for [Emma's] life and safety" by failing to timely and appropriately monitor and assess her condition, failing to timely and appropriately keep her physician and family informed of her medical condition, and failing to timely discharge her to a hospital on December 3, 2020.

Mayfield filed its reply in support of summary judgment on December 9. The ambulance patient care report and emergency room records discussed above as well as an affidavit of Coroner Jones and his coroner's report were attached to the reply as exhibits. Coroner Jones' affidavit stated that he was not a medical doctor, and that the entirety of his investigation into Emma's cause of death consisted of reviewing documents from JPMC's emergency department, speaking with the emergency department physician and staff, and speaking with Emma's family. Coroner Jones did not review any other hospital medical records or any Mayfield medical records, he did not speak to Emma's

---

[10] Congestive heart failure.

[11] Chronic obstructive pulmonary disease.

10

primary care physician or any physician that specialized in infectious disease or respiratory care, and he did not speak to anyone at Mayfield. The coroner's report recounts Coroner Jones' opinion that Emma's immediate cause of death was acute respiratory distress. It further listed CHF due to, or as a consequence of COPD, COVID, and type two diabetes as additional causes of death. Both the coroner's report and Jones' affidavit stated that no autopsy was performed.

Mayfield argued in support of its summary judgment motion that Jackson's claim was a "COVID-19 claim" by discussing each prong of KRS 39A.275(1)(a). As noted, subsection 1. of KRS 39A.275(1)(a) defines a claim that "[arises] from COVID-19" as an injury or harm that is caused by or that results from "[t]he actual, alleged, or possible exposure to, transmission of, or contraction of COVID-19[.]" Mayfield argued that the statute "applies to any injury arising after March 6, 2020, not only to COVID-19." It asserted that the thrust of Jackson's argument was that Emma suffered respiratory failure and death. Mayfield argued that her contraction of COVID was what "caused her respiratory failure and death[,]" and that the immunity statute therefore applied.

Under Subsection 2. (an injury or harm caused by or resulting from "[s]ervices, treatment, or other action performed to limit or prevent the spread of COVID-19[]"), and Subsection 3. (an injury or harm caused by or resulting from "[s]ervices performed by an entity outside the normal course of its business in response to COVID-19[]") Mayfield argued that those endeavors

11

were "indisputably occurring from March 6, 2020[,] through the end of [Emma's] residency at [Mayfield.]" In support, it only cited to generally applicable CMS[12] memoranda from August 26, 2020, and September 17, 2020; generally applicable CMS waivers granted to nursing homes during the pandemic; and a Kentucky Long-Term Care Facility COVID-19 Indicator Report from December 3, 2020, showing that Graves County facilities should have been testing its patients for COVID two times per week. It argued that because Emma had been transferred to its COVID unit, and because that unit only existed outside normal business operations to limit the spread of COVID, that Subsections 2. and 3. were also satisfied.

Finally, concerning gross negligence and whether additional discovery was required, Mayfield asserted that Jackson "had ample opportunity and time to make a gross negligence case, but [he had] not put forth any evidence that would support such a claim[,]" and that no such evidence existed.

Jackson argued in response that summary judgment would be inappropriate because there were still several material facts in dispute, not least of which was Emma's cause of death. He contended that her death was not caused by COVID, but rather Mayfield's neglect over the last few weeks of her life and its failure to timely act after she exhibited a clear change in condition on December 3, 2020. He relied on Dr. Mansfield's opinion that COVID was not a substantial factor in Emma's death and highlighted that

---

[12] Centers for Medicare and Medicaid Services.

Mayfield had provided no proof that her death was due solely to COVID. Moreover, Mayfield's reliance on Emma's death certificate as proof of her cause of death was insufficient, as a death certificate is only a vital record and Coroner Jones was neither a medical doctor nor was he qualified to diagnose medical conditions.

Jackson asserted that Mayfield neglected Emma both before and after she tested positive for COVID, evidenced by Emma's unplanned weight loss that began in August 2020 without appropriate action by Mayfield.[13]  Jackson also argued that in the twenty-six days before Emma tested positive for COVID on November 26, 2020, her Mayfield records contained only one day with a nurse's note (November 12, 2020) and that the note did not reflect that a complete nursing assessment was performed.[14]  In addition, in the seven days following her COVID diagnosis her medical records contained only two days with nurses notes that also do not reflect a complete assessment.

He additionally argued that when Mayfield found Emma unresponsive on the morning of December 3, 2020, it was a significant change in her condition that required Mayfield to notify her physician and family, to immediately transfer her to a hospital, and to immediately assess her and take any action necessary to ensure she received the care she required, but it did none of those

---

[13] We note that her Mayfield medical records indicate, both prior to and after her COVID diagnosis, that she was being given fortified shakes to address weight loss.

[14] Jackson further asserted that following Emma's contraction of COVID her physician ordered increased monitoring, including checking her pulse oximetry three times a day for thirty days and additional medications, but those orders are not in the record before us.

13

things until nearly five hours later. He contended that this delay was gross negligence in and of itself, supported by Dr. Mansfield's affidavit that opined that Mayfield's failure to act was a wanton or reckless disregard for Emma's life and safety.

Jackson further asserted that Mayfield had offered no evidence that there was a causal connection between any COVID countermeasure and Emma's injuries. The basic nursing care Jackson argued it failed to provide—including timely and appropriately monitoring her condition, timely notifications to her physician and family of changes in her condition, and ensuring she received proper nutrition—were essential functions of a nursing home, not actions taken outside the course of ordinary business or performed to limit the spread of COVID. Nor had Mayfield argued that it had to stop providing these basic nursing functions because of COVID, or that any countermeasure it employed impacted its ability to care for her. Instead, it made only general assertions that all nursing homes were employing countermeasures, and that Emma was placed on its COVID unit.

Jackson also argued that he was entitled to additional discovery on the disputed fact issues in the case as well as his claim of gross negligence, and that Mayfield had refused to participate in discovery in good faith.

Following the December 27, 2022, hearing the circuit court granted Mayfield's motion for summary judgment. Interestingly, although the circuit court's order quotes several subsections of KRS 39A.275, it does not recount or directly address the most crucial sections: subsections 1. through 3. of KRS

14

39A.275(1)(a) which define what it means for a claim to "[arise] from COVID-19[.]" The court instead simply found that Emma "died, at least in part, from COVID-19 as evidenced by the death certificate. As such, the Defendants are immune from suit unless gross negligence, wanton, willful, malicious, or intentional misconduct is shown." It further found that Jackson's allegations did not rise to the level of gross negligence as a matter of law. As the court found Mayfield was entitled to immunity under Kentucky's COVID immunity statute, it declined to address whether it was entitled to immunity under the PREP Act. The court dismissed all of Jackson's claims with prejudice.

The Court of Appeals unanimously affirmed the circuit court. *Jackson v. Mayfield KY OPCO, LLC*, 2023-CA-0260-MR, 2024 WL 1335637, *1 (Ky. App. Mar. 29, 2024). The court reasoned that KRS 39A.275 does not require the actual contraction of COVID to trigger immunity, but rather "even the 'alleged' or 'possible exposure' to, transmission of, or contraction of COVID-19 is sufficient to trigger immunity under KRS 39A.275(1)(a)1." *Id.* at *2. It further held that, although the statute does not provide immunity for gross negligence, Jackson had failed to present sufficient proof on that front. *Id.* at *2-*3. Ostensibly viewing Dr. Mansfield's affidavit as the only evidence of gross negligence Jackson presented, it held that "Dr. Mansfield's affidavit [does not] provide evidence sufficient to prove that [Mayfield was] grossly negligent . . . Appellant does not explain how Dr. Mansfield's affidavit provides proof, as it merely contains a conclusory statement." *Id.* at *3. The Court of Appeals then concluded that "[b]ecause COVID-19 was unquestionably a factor in [Emma's]

15

medical history the week before her death, Appellees are entitled to the statutory immunity granted under KRS 39A.275." *Id.* It did not address whether Mayfield was also entitled to immunity under the PREP Act.

Following the Court of Appeals' ruling, Jackson filed a motion for discretionary review in this Court, which we granted.

## II.    ANALYSIS

### A. Standard of Review

Kentucky Rule of Civil Procedure (CR) 56.03 allows a trial court to grant summary judgment in the movant's favor "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When pursuing a dismissal by summary judgment, the burden of proof is on the movant to show "that the adverse party could not prevail under any circumstances." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991).

This Court has "repeatedly admonished that [CR 56.03] is to be cautiously applied[,]" and that "[t]he record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Id.* Indeed, "[e]ven through a trial court may believe the party opposing the motion may not succeed at trial, it should not render summary judgment if there is any issue of material fact." *Id.* "Because summary judgment does not require findings of fact but only an

16

examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (citing *Malone v. Kentucky Farm Bureau Mut. Ins. Co.,* 287 S.W.3d 656, 658 (Ky.2009)). Whether a particular defendant is entitled to immunity is likewise reviewed de novo. *Bryant v. Louisville Metro Hous. Auth.,* 568 S.W.3d 839, 845 (Ky. 2019).

## B. The circuit court erred in granting summary judgment.

### 1) Immunity Under KRS 39A.275

This Court's consideration of KRS 39A.275 in this case is a matter of first impression.[15] The only published Kentucky jurisprudence concerning it is the Court of Appeals' opinion in *LP Louisville Herr Lane, LLC v. Buckaway*, 705 S.W.3d 31 (Ky. App. 2024).[16] In that case, Shirley Wilson underwent back surgery at a hospital and remained hospitalized for eleven days thereafter; during her post-operative hospital stay her surgeon never observed any signs of infection in her surgical wound and it appeared to be healing properly. *Id.* at 32. Shirley was then discharged to a nursing home on April 28, 2020, and a follow up telehealth conference with her surgeon was scheduled for May 18. *Id.* It was routine for that nursing home to provide post-surgical care, it was

---

[15] While KRS 39A.275 was repealed by the General Assembly's enactment of Senate Bill 5 on December 31, 2025, Senate Bill 5 provides that "[a]ny causes of action that are prohibited. . . under this Act will remain so after its repeal." *Jackson*, 2023-CA-0260-MR, 2024 WL 1335637 at *2 n.1.

[16] This Court denied discretionary review in *Buckaway* on February 13, 2025, during the pendency of the appeal now before us.

given detailed wound care instructions from the hospital, and it was directed to contact Shirley's physician if any concerns about her surgical wound arose. *Id.*

During the May 18 telehealth conference, the nursing home staff discovered that Shirley's surgical wound was infected. *Id.* The following day, Shirley was found unresponsive and was immediately transferred to the hospital where she was diagnosed with a "catastrophic E. coli infection" that required multiple treatments and surgeries. *Id.* Shirley and her husband filed a negligence suit against the nursing home for failing to provide appropriate wound care and failing to communicate with her physician. *Id.* The suit was later revived and amended to include a claim for wrongful death after Shirley died of congestive heart failure in April 2022. *Id.* at 33.

The nursing home filed a motion for summary judgment alleging entitlement to immunity under both KRS 39A.275 and the PREP Act. *Id.* It argued that the telehealth conference was a COVID countermeasure to prevent the spread of the disease, and that the infection "was caused by or resulted from the COVID-19 restriction that prevented both Shirley's physician and a nurse practitioner from examining [her] in person." *Id.* at 34. The circuit court denied the motion, and the nursing home appealed. *Id.*

A Court of Appeals panel unanimously affirmed the circuit court. *Id.* It reasoned that pursuant to the COVID immunity statute, an injury or harm "arises from COVID-19," and is therefore a "COVID-19 claim," when it is "caused by or [results] from" either "actual, alleged, or possible exposure to, transmission of, or contraction of COVID-19[,]" "[s]ervices, treatment, or other

18

action performed to limit or prevent the spread of COVID-19[,]" or "[s]ervices performed by an entity outside the normal course of its business in response to COVID-19[.]" *Id.*; KRS 39A.275(1)(a)1., (c). Thus, the *Buckaway* Court concluded that "[i]mmunity is not triggered under the statute unless **a causal connection exists** between the injury suffered and the action taken by the care provider." 705 S.W.3d at 34. The court went on to agree with Shirley's estate that

> the telehealth conference came too late to be a factor in causing Shirley's injuries. Evidence considered by the trial court indicated that by the time of the telehealth conference, Shirley had already suffered days—if not weeks—of neglect by nursing home staff. The wound infection was described by Shirley's physician as very deep and "clearly caused by failure to keep the wound clean and change the dressing" as ordered. Another doctor confirmed that the wound had probably been infected for several days before the May 18 telehealth conference. Finally, the nursing home's director testified unequivocally that COVID-19 protocols did not prevent staff from caring properly for Shirley's wound.

*Id.*

While we acknowledge that the facts of *Buckaway* are distinguishable from the case at bar, its interpretation of the COVID immunity statute is sound. The statute does not, as Mayfield argues, apply to any injury occurring during the declared COVID emergency. Rather, it applies to "any claim or cause of action for an actor or omission *arising from COVID-19*[.]" KRS 39A.275(1)(c) (emphasis added). And, in order for a claim to arise from COVID, the injury must be "*caused by or [result] from*" the "actual, alleged, or possible exposure to, transmission of, or contraction of COVID-19[,]" "[s]ervices, treatment, or other action performed to limit the spread of COVID-19[,]" or

19

"[s]ervices performed. . . outside the normal course of business in response to COVID-19[.]" KRS 39A.275(1)(a) (emphasis added). Stated differently, Mayfield cannot prove entitlement to immunity simply by demonstrating that Emma had COVID at the time of her death. Rather, it must demonstrate that the injuries Jackson alleged were *caused by* her contraction of COVID; were *caused by* services, treatment, or other actions Mayfield performed to limit the spread of COVID; or were *caused by* services Mayfield performed outside the normal course of business in response to COVID.[17] We now address Mayfield's arguments under each of those requirements in turn.

## KRS 39A.275(1)(a)1.

As the party bearing the burden of proof, to show entitlement to summary judgment under KRS 39A.275(1)(a)1. Mayfield had to demonstrate, viewing the record in a light most favorable to Jackson, "that there is no genuine issue as to any material fact" regarding whether Emma's "injury or harm . . . [was] caused by or [resulted] from. . . [her] contraction of COVID-19[.]" CR 56.03; *Steelvest,* 807 S.W.2d at 480.

Preliminarily, while certainly the most serious injury Jackson alleged was Emma's death, he also alleged various injuries and misconduct by Mayfield that appear to have no relation to her contraction of COVID. For example, his

---

[17] Mayfield has cited to the legislative history of the statute to support the exceedingly broad interpretation for which it advocates. However, under our tenets of statutory construction, "[o]nly if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history[.]" *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011). As the statute plainly requires a causal connection on its face, we need not consider its legislative history.

complaint asserted that she suffered various injuries such as ongoing neglect and insufficient medical care that was intentionally concealed by Mayfield's use of false charting practices, malnutrition, abuse, and violations of her dignity. He also asserted that Mayfield engaged in misconduct such as engaging in fraud, failing to adequately train and supervise its staff, failing to maintain appropriate staffing levels, and failing to take reasonable steps to prevent, eliminate, and correct deficiencies in its resident care. Mayfield has not argued that these alleged injuries have any causal connection to Emma's contraction of COVID. They would therefore not fall under KRS 39A.275's immunity protections. The circuit court accordingly erred by dismissing them with prejudice on the basis that Mayfield was entitled to immunity from claims related to her death.

In other words, even assuming arguendo that Mayfield is entitled to immunity for some claims related to Emma's death, it would not be entitled to immunity for alleged injuries that are unrelated to COVID, or for alleged misconduct that has no relation to COVID. It would likewise not be immune for any alleged injuries that occurred prior to March 6, 2020, when the public health emergency was declared in Kentucky. KRS 39A.275(1)(a)("'Arising from COVID-19' means an injury or harm that allegedly occurred *on or after* the emergency was declared on March 6, 2020[.]" (emphasis added).

Nor has Mayfield argued that it is entitled to immunity for any alleged injuries other than Emma's death. It instead focuses its argument entirely on Emma's death and, relying on her death certificate, asserts that KRS

21

39A.275(1)(a)1. entitled it to summary judgment against all of Jackson's claims because "it is clear from the record that [Emma] contracted COVID-19 which caused her respiratory failure and death." [18] We disagree.

To begin, a death certificate does not conclusively establish a decedent's cause of death. Rather it is a vital record, KRS 213.011(14), that constitutes "prima facie evidence of the fact, place, date, and time of death and the identity of the decedent." KRS 397.1005(2). Indeed, our statutes contemplate that a coroner's initial conclusion about a cause of death may be changed if an autopsy is later performed. KRS 72.465(2) ("In the event an autopsy is performed . . . subsequent to the time that a death certificate has been filed . . . the coroner shall notify the Vital Statistics Branch of any change that may be necessary in the original certificate."). Coroner Jones made it clear in his affidavit that he is not a medical doctor, that he is not qualified to diagnose medical conditions, and that no autopsy was performed on Emma. In contrast, Dr. Mansfield testified that based on the information available to him and Emma's partially provided medical records, COVID was not a substantial factor in causing her death.

Moreover, even if Emma's death certificate could conclusively establish her cause of her death, the certificate itself did not state that Emma's sole

---

[18] Mayfield has relied upon *Tipton v. St. Joseph Health Sys., Inc.*, 2021-CA-0985-MR, 2022 WL 2541827 (Ky. App. July 8, 2022), throughout the duration of this litigation. *Tipton* is a Court of Appeals opinion that this Court denied discretionary review of and ordered to be depublished on December 7, 2022. It is neither authoritative nor persuasive precedent. The same can be said of Jackson's reliance on *RBRC, Inc. v. Massamore*, 2023-CA-0600-MR, 2024 WL 2097553 (Ky. App. May 10, 2024).

cause of death was COVID. Rather, it also listed CHF and COPD as her causes of death, both of which were conditions she had prior to contracting COVID and are conditions that can cause both respiratory distress and death in the absence of COVID. While it is certainly possible that COVID was Emma's cause of death, it is just as possible—particularly when viewing the record in a light most favorable to Jackson—that her COVID was asymptomatic and that her cause of death was actually one of her numerous preexisting conditions, many of which affect either the heart, the lungs, or both. And therein lies the rub. Summary judgment is only appropriate if there are no material facts in dispute, and under KRS 39A.275(1)(a)1. Mayfield must show that Emma's injury, i.e., her death, was caused by her contraction of COVID. But based on the evidence of record there is clearly a material fact in dispute, at the very least, regarding whether Emma's death was caused by COVID. We consequently hold that the circuit court erred by granting summary judgment to Mayfield under KRS 39A.275(1)(a)1. on the basis that "Emma . . . died, at least in part, by COVID-19[.]"

We find non-authoritative support for our holding in the Indiana Court of Appeals opinion of *Waggoner v. Anonymous Healthcare Sys., Inc.*, 250 N.E.3d 1091 (Ind. Ct. App. 2025). In that case, the decedent Elmer Waggoner arrived at a Kentucky hospital in January 2022 five days after testing positive for COVID; his symptoms included aches, a deep dry cough, and severe COVID pneumonitis. *Id.* at 1094. He was then transferred to a second Kentucky hospital due to the severity of his condition, which continued to worsen until

23

he was transferred to "Anonymous Hospital 1" in Indiana on January 27, 2022. *Id.* His condition had deteriorated so severely that Hospital 1 medically paralyzed him and placed him on a ventilator due to his respiratory failure and "pneumonia due to [the] COVID-19 virus." *Id.* (quotation marks omitted). On February 9, Elmer's treatment team noted the development of a bed sore on his lower back due to his remaining in a prone position for an extended period of time. *Id.* At that time the bed sore contained necrotic tissue but had no overt signs of infection. *Id.*

On March 3, Elmer was transferred to "Anonymous Hospital 3"[19] for further treatment; he remained on a ventilator but tested negative for COVID-19. *Id.* at 1095. His pressure wound continued to worsen and showed signs of infection. *Id.* On March 17, he was transferred back to Anonymous Hospital 1 while still on a ventilator; he died there on March 29. *Id.* His death certificate listed his cause of death as cardiopulmonary arrest caused by acute hypoxic and hypercapnic respiratory failure, sepsis, and necrotizing fasciitis. *Id.* at 1095-96.

One year later, the executrix of Elmer's estate filed a proposed complaint with the Indiana Department of Insurance alleging that the numerous medical personnel and hospitals had been negligent in their treatment of his bed sore. *Id.* at 1096. A physician then requested the formation of a medical review

---

[19] For clarity, although *Waggoner* involved an "Anonymous Hospital 2" as a named party, the opinion itself only discusses an "Anonymous Hospital 1" and an "Anonymous Hospital 3."

panel, but before it could be established some of the defendants filed a motion for summary judgment with a trial court. *Id.* The trial court ultimately found, in relevant part, that the defendants were immune under Indiana's COVID immunity statute and granted summary judgment in their favor, thereby dismissing the executrix's complaint with prejudice. *Id.* at 1097.

Like Kentucky, Indiana appellate courts review a grant of summary judgment by determining whether "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" *id.* (citing Ind. Trial Rule 56(C)) "[drawing] all reasonable inferences in favor of the non-moving party[.]" *Id.* (quoting *Wilkes v. Celadon Grp., Inc.,* 177 N.E.3d 786, 789 (Ind. 2021)). But, unlike Kentucky, "[b]efore a plaintiff may file suit against a health care provider alleging medical malpractice, the plaintiff must submit a proposed complaint to a medical review panel and the panel must give its opinion." *Id.* (citing I.C.[20] § 34-18-8-4 (1998)).[21]

Prior to the panel issuing an opinion, a trial court may perform one or both of two tasks: determining an affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana Rules of Procedure or compelling discovery. *Id.* (citing I.C. § 34-18-11-1(a)). However, a trial court

---

[20] Indiana Code.

[21] Kentucky's General Assembly previously attempted to establish a similar practice, but this Court held it to be unconstitutional. *See Commonwealth of Kentucky v. Claycomb by and Through Claycomb*, 566 S.W.3d 202, 205 (Ky. 2018). Medical malpractice claimants in this Commonwealth must instead comply with the requirements of KRS 411.167.

may not preliminarily rule on any affirmative defense or issue of law that is reserved for written opinion by the panel, including whether "[t]he conduct complained of was or was not a factor of the resultant damages[,]" i.e., causation. *Id*. at 1097-98. (quoting I.C. § 34-18-11-1(b)).

On appeal, the executrix argued that the trial court erred by finding the defendants were entitled to immunity because their "immunity [hinged] on an issue reserved for the medical review panel, specifically causation." *Id*. at 1098. She asserted that "Elmer's pressure wound and his subsequent death were not caused by COVID-19 or [the defendants'] treatment of his COVID-19 symptoms but by the negligence of some or all the defendants in preventing and treating the pressure wound." *Id*. Thus she argued, and the Indiana Court of Appeals agreed, that "the question of immunity cannot be decided until the panel decides the causation issue." *Id*. The court reasoned that Indiana's COVID immunity statute directs in relevant part:

> [T]he following apply to the provision of health care *services arising from a state disaster emergency* declared under IC 10-14-3-12 to respond to COVID-19:
>
> (1) A person providing health care services or emergency medical services, whether in person or through telemedicine services permitted by IC 25-1-9.5, at a facility or other location where health care services or emergency medical services are provided may not be held civilly liable for an act or omission relating to the provision or delay of health care services or emergency medical services *arising from a state disaster emergency* declared under IC 10-14-3-12 to respond to COVID-19.
>
> (2) An employer, including an agency that provides or arranges health care services or emergency medical services, of a person described in subdivision (1) may not be held civilly liable for an act or omission relating to the provision or delay of health care

26

> services or emergency medical services *arising from a state disaster emergency* declared under IC 10-14-3-12 to respond to COVID-19.

*Id.* at 1098-99 (emphasis added) (quoting Ind. Code § 34-30-13.5-1(b) (2021)). Based on this statutory language, the court held that "[t]he question of whether all or some of the defendants' provision of services to Elmer for his pressure wound 'arose' out of the state disaster emergency *hinges upon causation*, a matter for the medical review panel to decide." *Id.* at 1099 (emphasis added). The court reasoned that while Elmer was originally hospitalized for COVID, and that he first developed the bedsore while ventilated to treat his COVID, the executrix had provided "expert witness evidence that [stated the defendants'] mistreatment of the bed sore caused Elmer's death, regardless of his prior COVID diagnosis and symptoms. Indiana Code section 34-30-13.5-5-1(b) does not bar [the executrix's] claims pending the medical review panel's determination of causation." *Id.*

In the case at bar, while the process of determining Emma's cause of death will be different from that utilized in Indiana, the reasoning of the *Waggoner* Court is on point: immunity is only available under Kentucky's COVID immunity statute if Emma's death was only "caused by" her contraction of COVID. And, accordingly, summary judgment was inappropriate while there remains a material question of fact as to whether her death was actually "caused by" COVID.

27

**KRS 39A.275(1)(a)2.**

Mayfield has also failed to demonstrate that it was entitled to summary judgment under subsection 2. of KRS 39A.275(1)(a). As noted, that provision required it to demonstrate that Emma's alleged injuries and death were caused by services, treatment, or other action performed to limit the spread of COVID. Mayfield argues this provision is applicable because it was performing such services and treatments. Yet, apart from the undisputed fact that it had a dedicated COVID unit, Mayfield has provided no direct proof of any services or treatments it was providing to limit the spread of COVID, let alone any proof that Emma's injuries or death were *caused by* those services.

Before the circuit court Mayfield introduced generally applicable CMS memoranda directed to "State Survey Agency Directors" about the protocols all nursing homes were supposed to be following during the pandemic. But it introduced no evidence that it was following any of those directives or that doing so somehow caused Emma's alleged injuries or death. We likewise fail to discern how the exhibits it provided of CMS's "Emergency Declaration Blanket Waivers for Health Care Providers," or the Kentucky COVID indicator report went towards showing its entitlement to summary judgment under KRS 39A.275(1)(a)2. We note that Mayfield refused to produce discovery related to anything other than the facility's floor plan and some of Emma's own medical records. The Court therefore cannot know how Mayfield applied those CMS directives in its facility.

28

**<u>KRS 39A.275(1)(a)3.</u>**

Finally, in order to be entitled to summary judgment under KRS 39A.275(1)(a)3., Mayfield had to demonstrate that there were no issues of material fact regarding whether Emma's alleged injuries and death were caused by services it performed that were outside the normal course of its business in response to COVID. Similar to its argument under subsection 2. of the statute, Mayfield asserts in a conclusory manner that because Emma was placed on its COVID unit, it is entitled to immunity. But, again, it has not explained how Emma being placed on its COVID unit, or how any other services it may have provided outside the normal course of its business in response to COVID, caused Emma's death or alleged injuries.

To be clear, our holding should not be interpreted to hold that Mayfield cannot under any circumstances show entitlement to immunity under KRS 39A.275. Rather, we simply hold that that there remain material issues of fact under the circumstances of this case that make summary judgment improper at this stage.

**2) Gross Negligence**

As we have previously discussed, the COVID immunity statute does not provide immunity to essential service providers for gross negligence. KRS 39A.275(8)(b). The circuit court found in its order granting summary judgment that Jackson's "allegations of negligence [did] not rise to the level of 'gross negligence' in [Emma's] death as a matter of law." But that is not the inquiry when addressing a motion for summary judgment. Rather, the question is

29

whether Jackson's allegations were sufficient to create a material issue of fact as to whether Mayfield was grossly negligent.

Gross negligence has been defined by this Court as "a 'wanton or reckless disregard for the lives, safety, or property of others[,]'" *Gibson v. Fuel Transp., Inc.,* 410 S.W.3d 56, 59 (Ky.2013) (quoting *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 870 (Ky. 2016)). Moreover, "[e]ven where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts." *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985) (quoting *Brown v. Riner,* 500 P.2d 524, 528 (Wyo. 1972)).

> The usual meaning assigned to. . ."wanton," or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. . . .

*Kirschner by Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840, 843 (Ky. 1988) (quoting Prosser & Keeton on the Law of Torts, 5th Ed. (1984), Chapt. 5, Sec. 34, pp. 212–13)). *Black's Law Dictionary* similarly defines "wanton" as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences[,]" *Wanton*, BLACK'S LAW DICTIONARY (12th ed. 2024), and defines "reckless" as being "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash." *Reckless*, BLACK'S LAW DICTIONARY (12th ed. 2024).

30

The primary allegation Jackson made in support of his assertion that Mayfield was grossly negligent was its nearly five-hour delay in obtaining medical intervention for Emma on the day she died. Specifically, he alleged that Mayfield discovered that its eighty-eight-year-old resident who was unable care for herself and had a litany of potentially fatal medical issues was unresponsive, but it failed to take any action at all for her until nearly five hours later. And those allegations appear to be supported by Emma's medical records from Mayfield and Dr. Mansfield's testimony that, in his opinion, Mayfield's inaction was a wanton or reckless disregard for Emma's life and safety. While we do not opine herein that this *was* gross negligence, we do hold that Jackson has presented enough evidence to create a material issue of fact as to whether Mayfield's failure to intervene constituted gross negligence, and that circuit court consequently erred by granting summary judgment.

Mayfield also argues that Jackson failed to properly preserve his argument that the circuit court erred by finding that his gross negligence claim was unsupported and failed to preserve his entitlement to additional discovery. First, Jackson's complaint asserted gross negligence, and his response to Mayfield's motion for summary judgment argued that "[f]ailing to appropriately respond to [Emma's] significant change in condition for five (5) hours is gross negligence." Jackson raised an identical argument in his brief before the Court of Appeals and further asserted that he "[had] alleged, and [had] put forth expert evidence, that [Mayfield was] grossly negligent for which there is no

31

immunity from suit." That issue is accordingly properly before this Court for review.

Second, Jackson filed thorough discovery requests that went largely unanswered. He then filed a lengthy motion to compel discovery that explained why he believed each discovery request was appropriate and filed separate motions to compel the production of emails, audit trails, and Mayfield's deposition. Jackson argued in his response to Mayfield's motion for summary judgment that Mayfield failed to participate in discovery in good faith and that the circuit court "should permit [him] to take discovery on the disputed fact issues, as well as the claims of gross negligence." Finally, Jackson asserted in his Court of Appeals brief that the circuit court "erred when it denied [his] request for discovery." This issue, too, is accordingly properly before this Court. Because there are material issues of fact in dispute, and because discovery in this case has been extremely limited thus far, we further hold that Jackson is entitled to additional discovery on remand, subject to the limitations of CR 26.02.

## C. The PREP Act

Neither the circuit court nor the Court of Appeals addressed Mayfield's entitlement to immunity under the PREP Act. And Mayfield has not provided briefing on this issue other than its argument that, should this Court find it is not entitled to immunity under KRS 39A.275, it should remand to the circuit court to determine whether it is immune under the PREP Act. We therefore decline to address Mayfield's argument that it is entitled to immunity under the

32

PREP Act at this time. On remand, the circuit court may address Mayfield's immunity argument under the PREP Act if Mayfield chooses to pursue it after discovery is complete.

### III.  CONCLUSION

Based on the foregoing, we reverse the Court of Appeals, vacate the Graves Circuit Court order granting summary judgment, and remand for further proceedings consistent with this Opinion.

Lambert, C.J.; Bisig, Conley, Keller, Nickell and Thompson, JJ, sitting. Lambert, C.J.; Conley, Nickell and Thompson, JJ., concur. Keller, J., dissents by separate opinion which Bisig, J., joins. Goodwine, J., not sitting.

KELLER, J., DISSENTING: Ms. Emma Hayes, age 88 at the time of her death, was a resident of Mayfield Health and Rehabilitation from February 6, 2018, until her transfer to the hospital on December 3, 2020. She suffered from a number of ailments as noted in her medical record of December 3, 2020, including, but not limited to, chronic obstructive pulmonary disease ("COPD"), atrial fibrillation, congestive heart failure, hypertension, diabetes, dysphagia, anemia, osteoarthritis, gastro-esophageal reflux disease, diverticulosis, hernia, peripheral vascular disease, cerebral atherosclerosis, vascular dementia without behavioral disturbance, major depressive disorder, generalized anxiety disorder, chronic pain syndrome, and COVID-19. Sadly, Ms. Hayes died on December 3, 2020, and her death certificate as noted by the coroner listed acute respiratory distress, congestive heart failure, COPD, and COVID-19 as causes of death.

33

Because I would hold that KRS 39A.275 acts as a bar to Appellant Hollie Jackson's[22] ("Jackson") negligence claims and that the Graves Circuit Court did not err in finding no gross negligence on summary judgment, I respectfully dissent.

**Standard of Review**

"The standard of review on appeal of summary judgment is whether the trial court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Carter v. Smith*, 366 S.W.3d 414, 419 (Ky. 2012). Moreover, "[t]he party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 199 (Ky. 2001). "[A] party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 482 (Ky. 1991).

**Immunity under KRS 39A.275**

Jackson alleges that summary judgment was inappropriate here because there is a material dispute in the facts regarding whether Ms. Hayes died from COVID-19, particularly given that her death certificate lists COVID-19 as a cause of death, but the affidavit from Dr. Mansfield indicated that COVID-19

---

[22] Hollie Jackson is the son of Emma Hayes.

34

was not a substantial factor in her death. Whether COVID-19 substantially caused Ms. Hayes' death is not a distinction with a difference in this instance given the broad application of the statute. Even if 39A.275(1)(A)(1.) would bar a claim from proceeding only if it can be proven that COVID-19 caused Ms. Hayes' death,[23] at the very least, her claim would be granted immunity under 39A.275(1)(A)(2.).

KRS 39A.275(1)(A)(2.), in conjunction with KRS 39A.275(2) and KRS 39A.275(1)(c), provides immunity from certain claims pertaining to "an injury or harm . . . caused by or resulting from . . . [s]ervices, treatment, or other action performed to limit or prevent the spread of COVID-19." If nothing else is true, it is certainly true that Jackson's claims pertain to the alleged negligent care (service) in a COVID-19 unit (an action performed to limit or prevent the spread of COVID-19). Ultimately, whether Ms. Hayes died from COVID-19 was not material to the resolution of Jackson's claims against Mayfield, and summary judgment was appropriate.

While it may seem as though this statute, when read literally, grants a rather broad shield of immunity, this is exactly what the General Assembly intended. As anyone reading this opinion is likely well aware, COVID-19 was an unpredicted, unprecedented pandemic that wreaked havoc on the

---

[23] Which, to be clear, KRS 39A.275(1)(A)(1.) should not be construed so narrowly. On its face, KRS 39A.275(1)(A)(1.) allows for immunity even for "an injury or harm . . . caused by or resulting from . . . the *alleged, or possible exposure to, transmission of*, or contraction of COVID-19." (emphasis added). Nonetheless, splicing into KRS 39A.275(1)(A)(1.) and the question of causation is unnecessary where, as here, the answer is even more clear under KRS 39A.275(1)(A)(2.).

Commonwealth's health care facilities. This was a time when existing as a functioning member of society — whether that be as a business owner, an administrator, a health care provider, medical staff, or a frail nursing home resident — carried the significantly increased risk of contracting a life-threatening illness. Healthcare and other workers were asked to leave the safe confines of their home and enter a world where a deadly virus lurked ready to attack in ways not yet fully known or understood. Yet, the alternative — completely shutting down society — would leave those who needed treatment for both COVID-related and non-COVID-related illnesses, daily care in nursing homes, groceries, and emergency response without viable alternatives, even in life-threatening circumstances. The General Assembly determined that ordinarily existing allocations of liability should not stand as a barrier to keeping essential services, including nursing homes, open. *See* General Assembly Regular Session, House Chambers, March 30, 2021, Part One at 1:06:41–1:07:25 (https://ket.org/legislature/archives/2021/regular/house-chambers-part-1-201136) (last visited Oct. 24, 2025) (explaining that the SB 5 was a response to a "cry from many for protections from liability related to the pandemic, everything from understaffing to unexpected occurrences that could result in liability that is tied directly to or caused from the contraction of or transmission of the COVID virus"); General Assembly Regular Session, Senate Chambers, March 1, 2021, 2:14:54–2:15:01 (https://ket.org/legislature/arch

ives/2021/regular/senate-chambers-175526) (last visited Oct. 24, 2025) ("When you're deemed essential, that means you are providing a service or a good to keep your community going.").

The breadth of this bill was not without criticism in the General Assembly. The relevant legislative sessions made clear that the General Assembly was contemplating a bill that would provide protections from liability for negligent acts by businesses providing essential services during the COVID-19 pandemic. Senator Stivers warned against "horrific reaching effects," including: immunity from liability for truck drivers who, while providing an essential service like delivering liquor, negligently takes his eyes off the road and causes a devastating collision, General Assembly Regular Session, Senate Chambers, March 1, 2021, 1:20:10–1:21:27 (https://ket.org/legislature/ archives/2021/regular/senate-chambers-175526) (last visited Oct. 24, 2025); immunity from liability for a hospital who negligently kills a mother that is giving birth, although the death is not otherwise COVID-19 related, *id.* at 1:21:55–1:22:19; immunity from liability for a mechanic that negligently fixes the brakes of a car and causes a fatal accident, *id.* at 1:22:19–1:22:37; immunity from liability for a grocer selling contaminated foods, *id.* at 1:22:37–1:22:40; and immunity from liability for a pharmacist who gives a patient the wrong pills and kills them, *id.* at 1:22:40–1:22:45. Senator McGarvey warned that the bill was so broad that it could cover injuries from slipping and falling in a grocery store a year after the pandemic is over. *Id.* at 2:21:37–2:21:46. In response to concerns that negligently failing to repair a sidewalk or driveway a

year after the pandemic has ended would be shielded from liability, Senator

Reginald Thomas stated:

> Now the injuries have nothing to do with COVID at that point, the person doesn't get injured or break down because of COVID, they didn't contract COVID, . . . they haven't been harmed by any COVID related activity, but if you follow the senator from Clay's response, . . . there's no liability there. Nothing to do with COVID, but because of the way this bill is written, they would have no liability whatsoever.

*Id.* at 2:10:27–2:10:52. Despite these concerns, but certainly in light of these concerns, the bill was passed. The General Assembly clearly intended to build protections around businesses providing essential services during the global pandemic, even when the harm was not a direct result of the contraction of the COVID-19 virus but rather a result of society adapting to and responding to the COVID-19 pandemic.

Considering these examples, the analysis of this matter becomes straightforward. It is clear that Jackson's claim involves "an injury or harm . . . caused by or resulting from . . . [s]ervices, treatment, or other action performed to limit or prevent the spread of COVID-19." While receiving care in a nursing home, Ms. Hayes tested positive for COVID-19. She was then transferred to a COVID-19 unit in the same nursing home, where she received specialized monitoring and treatment for COVID-19 and her cornucopia of pre-existing health conditions. Claims that Mayfield was negligent in providing care to Ms. Hayes in the COVID-19 unit are clearly covered by KRS 39A.275.

**Gross Negligence**

To assuage fears about the breadth of KRS 39A.275's sweeping grants of immunity, the statute does not apply to "any liability of an owner for gross negligence, or wanton, willful, malicious, or intentional misconduct." KRS 39A.275(3); *See also* General Assembly Regular Session, House Chambers, March 30, 2021, Part One at 1:14:40–1:15:17 (https://ket.org/legislature/archives/2021/regular/house-chambers-part-1-201136) (last accessed October 24, 2025) ("The purpose of this bill . . . is to give some protections and some immunity to businesses including hospitals, but at the same time, there were some very large concerns in the legal community that this would create an immunity to prevent claims that were legitimately valid, that were only secondarily related to COVID-19, so I want to say very clearly that through all of the sections of this bill, any gross negligence, any willful or intentional misconduct, is not protected."). Gross negligence has been defined in our case law as behaving recklessly or the failure to use slight care. *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001).

To this end, the circuit court held a hearing on Mayfield's motion for summary judgment, and the court's order reflects that it was presented with evidence that Ms. Hayes was diagnosed with COVID-19 on November 26, 2020, and transferred to Mayfield's COVID-19 unit on the same day. An x-ray showed no acute cardiopulmonary disease. Ms. Hayes' physician ordered increased monitoring, including checking her pulse oximetry three times a day, and additional medications. At 8:51 a.m. on December 3, 2020, Ms. Hayes did

39

not receive her medication because she was unable to be aroused. An hour later, at 9:51 a.m., her vitals indicated that she was not hypoxic. Her oxygen saturation was 98 percent, her respiratory rate was 18 breaths per minute, and her temperature was 97.8, all within normal limits. Her blood pressure was slightly elevated, but she had a history of hypertension. Almost four hours later, around 1:45 p.m., Ms. Hayes again could not be aroused, but by this time, her vitals had deteriorated. Her medical records indicate that at that time, her blood pressure was 160/75, her pulse was 44 beats per minute, her oxygen saturation was 87%, her respiratory rate was 50 breaths per minute, her breathing was labored, her temperature was 99.6 degrees, and her upper extremities and head were twitching or jerking. Her son, Tommy, was notified of her condition and she was promptly transported to Jackson Purchase Medical Center via ambulance. Lifesaving measures and treatment were administered there, including intubation and mechanical ventilation. Unfortunately, around 3:40 p.m., approximately two hours after Mayfield noticed Ms. Hayes' vitals were amiss, Ms. Hayes passed away.

After the hearing on Mayfield's motion for summary judgment, the circuit court gave both parties time to submit additional filings before issuing its final order. The circuit court ultimately found that:

> Here, [Jackson] has not shown or alleged willful, malicious, or intentional misconduct. [Jackson]'s Complaint asserts claims of negligence and further assert such acts of negligence constitute "gross negligence" under Count ONE, and further allege under Count TWO that the acts of negligence amount to gross negligence. Plaintiff's answers to the interrogatories do not set forth evidence of gross negligence. While it is sad 88-year-old Emma Hayes died, the

40

Plaintiff's allegations of negligence do not rise to the level of "gross negligence" in her death as a matter of law.

In arguing that the circuit court erred in granting summary judgment and that the record contained enough evidence of gross negligence to survive a motion for summary judgment, Jackson's arguments fall into two main categories: the five-hour delay between Mayfield's first indication that Ms. Hayes' condition had worsened and her eventual transfer to the hospital, and false charting in Ms. Hayes' medical records. As for Jackson's first argument, he contends that Mayfield's failure to notify Ms. Hayes' physician or family or to send Ms. Hayes to the hospital for five hours after she was unable to be aroused or take her medication on the morning of December 3, 2020, was gross negligence. The record does not shed much light on the circumstances surrounding Ms. Hayes' inability to be aroused, whether this was normal for her, whether this was a common or concerning symptom of COVID-19 or any other illness she had, whether her physician had issued warning signs that would prompt intervention or what those warning signs were if so, whether the inability to be aroused was a warning sign in which her physician had asked to be contacted in the event of, or whether she displayed any other concerning symptoms.

What is known, however, is that an hour later, Mayfield checked Ms. Hayes' vital signs, which were all in the normal range for her. Displaying no other signs or symptoms (made known to us), Mayfield rechecked her vital signs within four hours, even though Ms. Hayes was only ordered to have vitals checked three times a day, which works out to every eight hours. It was not

41

until this second set of vitals were taken that Mayfield had realized multiple signs that something was amiss. Whatever doubt remains about the appropriateness of Mayfield's actions at the time are mitigated by an understanding that Ms. Hayes' unfortunate death took place at a time when hospitals were overfilled, patients were being turned away for treatment, a person going to the hospital exposed both themselves and those around them to COVID-19 (for which there was no vaccine available to the general public at the time) and other exacerbating diseases, and people were advised to stay home with COVID-19 symptoms unless critically ill. Mayfield utilized their discretion in determining whether and at what point it was appropriate to seek outside medical attention for Ms. Hayes, and it is not apparent that Mayfield was grossly negligent in exercising that discretion.

Jackson next alleges that Mayfield was grossly negligent when it falsely charted instances in Ms. Hayes' medical record that it provided services to Ms. Hayes after Ms. Hayes had died. Assuming arguendo that Mayfield had falsely charted, Jackson still must show how this false charting caused Ms. Hayes' alleged injuries. To prove a common law negligence claim, the plaintiff must present evidence of "legal causation between the defendant's breach and the plaintiff's injury." *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). Jackson's theory of liability fails because Jackson failed to demonstrate how the false charting *caused* Ms. Hayes' death, particularly in light of the fact that the false charting occurred *after* Ms. Hayes' death, and Jackson fails to allege with specificity other instances of false charting before Ms. Hayes had passed.

42

Lastly, even if Jackson had sufficient evidence in the record to survive a summary judgment motion, he failed to properly preserve this issue before this Court. Rule of Appellate Procedure ("RAP") 32(A)(4) requires that Appellant's opening brief "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." "We have strictly mandated compliance with this rule since its inception under the prior Kentucky Rules of Civil Procedure." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 310 (Ky. 2023). Jackson failed to include such a statement in his opening brief. Despite this, Jackson claims that, because he raised both issues regarding allegations of gross negligence and whether he was permitted to engage in meaningful discovery with the circuit court and the Court of Appeals, these issues were properly preserved. Yet, we have said that "[t]he failure of an appellant's brief to conform to the appellate rules justifies the striking of the brief under RAP 31(H)(1)." *Gasaway*, 671 S.W.3d at 310. "If a party fails to inform the appellate court of where in the record his issue is preserved, the appellate court can treat that issue as unpreserved." *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021). Nevertheless, I need not opine on whether this Court should give sanctions, including treating the issue as unpreserved, for Jackson's failure to comply with RAP 32(A)(4) given that I would nevertheless affirm the granting of summary judgment.

43

**Discovery**

Jackson contends that he was wrongfully deprived of adequate discovery in the circuit court. His arguments are subject to the same failure to properly preserve under RAP 32(A)(4) and RAP 31(H)(1) as his arguments concerning the circuit court's alleged error in finding Jackson's gross negligence claim was unsupported. However, I would be inclined to decline sanctions in this instance. "[T]he critical point in preservation of an issue remains [whether] the question [was] fairly brought to the attention of the trial court." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 331 (Ky. 2014). Before the trial court, Jackson had filed a motion to compel, included arguments in his response to Mayfield's motion for summary judgment that Mayfield did not participate in discovery in good faith and that the circuit court should allow him to take discovery on disputed issues, and additionally argued at the hearing on summary judgment that more discovery was warranted. Before the Court of Appeals, Jackson argued in his brief that "the Graves County Circuit Court erred when it denied Plaintiff's request for discovery."

Turning to the merits of Jackson's discovery arguments, Jackson had filed a motion to compel which had not been explicitly ruled on before the hearing was held on the motion for summary judgment. Nonetheless, during the hearing on Mayfield's motion for summary judgment, the circuit court heard arguments about the sufficiency of discovery. Mayfield disclosed and argued that the Complaint was filed in November 2021, but that destruction of

44

the facility from a devastating tornado[24] delayed Mayfield's discovery responses until April 28, 2022. At that time, Mayfield produced third party medical records. Approximately one month later, Jackson made a settlement demand in which Mayfield responded within three weeks and made an offer. Mayfield then did not hear from Jackson for over four months. On October 18, 2022, Jackson rescinded his settlement demand and asked for additional voluminous discovery but, by that time, Mayfield had already begun working on its motion for summary judgment, which was filed within the next week. Jackson contended that after waiting for over a year, refusing to participate in good faith discovery, moving for dismissal on personal jurisdiction grounds and then later revoking that motion, and entertaining settlement negotiations for five months, Mayfield then asserted COVID immunity and requested summary judgment.

Objectively speaking, the Complaint was filed on November 9, 2021. Mayfield filed an answer on December 3, 2021. Jackson served discovery requests on December 6, 2021. On April 28, 2022, Mayfield served discovery responses, including answers and responses by Appellees Mayfield KY Opco, LLC, Clearview Healthcare Management KY, Crystal Janes, Hughes Ash, and Susan Allen to Jackson's first set of interrogatories and requests for production

---

[24] This tornado caused "profound damage, including the near-total destruction of Mayfield's downtown historic district. Over 3,778 residences, 183 commercial properties, and 103 other buildings were either damaged or totally destroyed, including the county courthouse and the Mayfield Consumer Products candle factory. Across Graves County, 24 people died, and at least 200 people were injured." *The Violent Tornado Outbreak of December 10-11, 2021*, NAT'L WEATHER SERV., https://www.weather.gov/pah/December-10th-11th-2021-Tornado (last visited Nov. 4, 2025).

of documents. On the same day, Appellee, The Portopiccolo Group, LLC ("Portopiccolo"), filed a Motion to Dismiss, alleging in part that Kentucky courts lacked personal jurisdiction over it. On May 24, 2022, the circuit court ordered limited discovery on the issue of personal jurisdiction. On June 14, 2022, Portopiccolo withdrew its Motion to Dismiss. On October 26, 2022, Mayfield filed a motion for summary judgment. On November 2, 2022, Jackson filed a motion to compel documents and responses to discovery, arguing that "Defendants' general, boilerplate objections are inappropriate and inapplicable under the Kentucky Rules of Civil Procedure and cannot be used to prevent proper discovery by Plaintiff." A hearing was held on Mayfield's motion for summary judgment on December 27, 2022. The circuit court ultimately granted summary judgment in favor of Mayfield, without explicitly ruling on Jackson's motion to compel but having heard arguments to that effect, on February 15, 2023.

We review a trial court's orders with respect to discovery for an abuse of discretion. *B. Dahlenburg Bonar, P.S.C. v. Waite, Schneider, Bayless & Chesley Co., L.P.A.*, 373 S.W.3d 419, 424 (Ky. 2012). "The trial court's determination that a sufficient amount of time has passed and that it can properly take up the summary judgment motion for a ruling is reviewed for an abuse of discretion." *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010). "[S]o long as a party responding to such a motion has had an adequate opportunity to conduct discovery beforehand, the circuit court does not abuse its discretion in

46

granting such a motion." *Eagle Furniture Mfrs., LLC v. Nautilus Ins. Co.*, 706 S.W.3d 780, 789 (Ky. App. 2025).

Here, Jackson had over a year from the time his lawsuit was filed to conduct discovery before the circuit court granted summary judgment. Jackson had from April 28, 2022, to contest the sufficiency of Appellees' discovery responses. However, it was not until almost six months later, and after Mayfield's motion for summary judgment had been filed, that Jackson filed a motion to compel. Jackson surely had adequate opportunity to engage in discovery; he need not wait until the eleventh hour, on the eve of a summary judgment hearing, to assert his right to discovery. It is also unclear *how* additional discovery would have changed the outcome. The major factual debate is in whether Ms. Hayes died from the COVID-19 virus, but as already discussed, that is not dispositive of Jackson's claims. Therefore, I would not find that the trial court abused its discretion in failing to grant Jackson's motion to compel or additional time for discovery.

**Other Claims**

In his original complaint, Jackson raised counts of negligence, medical negligence, violations of long-term care resident's rights, common law fraud, breach of fiduciary duty, negligence of administrators, and negligence of a registered nurse. The circuit court found that "every claim alleged by Plaintiff is barred by KRS 39A.275." To the extent that Ms. Hayes allegedly received negligent care from Mayfield, these claims are shielded by KRS 39A.275. To the extent that Jackson's other claims, such as violations of long-term care

47

residents' rights, common law fraud, and breach of fiduciary duties, concern acts or omissions which predate KRS 39A.275's protections, these claims were not preserved for our review to the trial court or to this Court.[25]

"A court or quasi-judicial body may not be found to be in error where it has not been given an opportunity to (1) rule on the issue or (2) correct any alleged error." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 312 (Ky. 2023) (quoting *Personnel Bd. v. Heck*, 725 S.W.2d 13, 18 (Ky. App. 1986)). "[W]hile the form of the objection does not control, the fact that an issue was made known to the trial court is paramount." *Id.* at 313. "The critical inquiry is whether . . . the trial court [had] a fair opportunity to 'get it right.'" *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 165 (Ky. 2004).

While KRS 39A.275 might not be quite broad enough to encompass Jackson's non-negligence claims,[26] Jackson failed to bring this to the attention of the circuit court, ask the circuit court for reconsideration, or otherwise present the circuit court the opportunity to address these issues. Indeed, in its Response to [Mayfield's] Motion for Summary Judgment submitted to the

---

[25] Although not raised as an issue before us, a thorough review of the circuit court's order granting summary judgment in favor of Mayfield necessitated a review of the appropriateness of the circuit court's dismissal of all claims as barred by KRS 39A.275.

[26] Jackson's complaint also alleges abuse, failure to appropriately train, educate, or supervise nurses aids, "concealing or failing to disclose the material facts that there was an epidemic of patient harm," "utilizing insufficient numbers of qualified nurse aides who were not adequately trained," failure to comply with licensing requirements and standards of care specified by law, concealing fraudulent conduct by manipulating and/or falsifying medical records, accepting payment for services and care not provided to Emma Hayes, and concealment of abuse and neglect occurring before March 6, 2020.

circuit court, Jackson states that "Ms. Hayes' injuries and death were caused by [Mayfield's] neglect over the last weeks and days of her life and their failure to timely and appropriately provide care to Ms. Hayes after she exhibited a change in condition." Jackson has not alleged otherwise to this Court, nor could he. "[W]e have often observed that we will confine ourselves to those errors pointed out in the briefs and will not search the record for errors on which to reverse a judgment." *Ballard v. King*, 373 S.W.2d 591, 593 (Ky. 1963). Accordingly, the circuit court's grant of summary judgment to Mayfield was appropriate. Therefore, I would affirm the Court of Appeals.

Bisig, J., joins.

COUNSEL FOR APPELLANT:

Jacques G. Balette
Juliette B. Symons
Marks, Balette, Young & Moss, PLLC

Henry David Hill
Law Office of David Hill


COUNSEL FOR APPELLEES:

Shem D. Beard
A. Pete Pullen
O'Bryan, Brown, & Toner PLLC


COUNSEL FOR AMICUS CURIAE,
KENTUCKY HOPSITAL ASSOCIATION:

Wesley R. Butler
Barnett Benvenuti & Butler PLLC